IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LT CHARACTER, LLC, and CLIFF DEAN, | § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Civil Action No. 4:24-cv-01053-BP |
| RITA MORT, | § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

This is a defamation and breach of contract case under Texas law. On October 24, 2024, Plaintiffs LT Character, LLC ("LT Character") and Cliff Mr. Dean ("Mr. Dean") sued a former independent contractor of LT Character, Defendant Rita Mort ("Ms. Mort"). Plaintiffs allege Ms. Mort defamed Mr. Dean after he terminated her from her role, and that she violated non-disclosure and non-circumvention provisions in an agreement she signed on August 3, 2022.

LT Character seeks an award of $78,901.03 for violations of the non-disclosure and non-circumvention provisions, and Mr. Dean seeks nominal damages of $1.00 for defamation. The parties waived a jury and instead tried their case to the Court on August 26, 2025. Following trial, the Court makes the following findings of fact and conclusions of law. Any finding of fact that may be deemed to constitute a conclusion of law shall be so considered and adopted as a conclusion of law. Any conclusion of law that may be deemed to constitute a finding of fact shall be so considered and adopted as a finding of fact.

## FINDINGS OF FACT

LT Character, LLC ("LT Character") is a limited liability company organized under Texas law. Its principal place of business is in Tarrant County, Texas. LT Character offers coaching and

mentorship programs to schools and young people in the Dallas-Fort Worth area and elsewhere. LT Character is managed by managers. There are two managers: LaDainian Tomlinson ("Mr. Tomlinson") and Mr. Dean. There also are two members of LT Character: Mr. Tomlinson and Mr. Dean. There are no other members. Mr. Tomlinson and Mr. Dean are co-owners. The evidence about the exact amount of equity each man owns in LT Character was inconclusive, but the Court finds that neither owns more than 50%. LT Character was formed on October 7, 2016, when Mr. Dean filed a certificate of formation with the Texas Secretary of State. LT Character does not have a company agreement. LT Character has operated at various times under the business names Tomlinson Center, LT Academy, and LaDainian Tomlinson Preparatory Academy.

Mr. Dean is a member and manager of LT Character. Mr. Dean is also the Central Executive Officer of LT Character. At one time, Mr. Dean was also a director of Tomlinson's Touching Lives Foundation ("the Tomlinson Foundation"). The Tomlinson Foundation is a nonprofit charitable organization that provides services and leaderships programs to underserved schools and students. While a director, Mr. Dean had approval authority regarding the use of the Tomlinson Foundation's funds.

Ms. Mort was an independent contractor of LT Character. Ms. Mort joined LT Character in either 2019 or 2020. In her role with LT Character, Ms. Mort worked with various independent school districts to establish partnerships and facilitate meetings between schools and LT Character. She also assisted in the company's sales of its character and development programs. While working as an independent contractor of LT Character, Ms. Mort also worked for the Tomlinson Foundation. Ms. Mort still works with the Tomlinson Foundation. In her capacity with the Tomlinson Foundation, Ms. Mort writes grants, which means that she composes the applications for grant awards from various organizations. While working as an independent contractor of LT

Character, LT Character paid Ms. Mort $3,000.00 a month by and through both LT Character and the Tomlinson Center. For her current work with the Tomlinson Foundation, the Tomlinson Foundation pays Ms. Mort $3,000.00 a month. At all times relevant to this case, Ms. Mort did not have general access or visibility to the Tomlinson Foundation's financial information or sources of revenue. Mr. Dean terminated Ms. Mort's association with LT Character in 2023.

John Palguta ("Mr. Palguta") is a senior wealth manager employed by MAI Capital Management ("MAI"). MAI is a financial advising service that prepares tax returns for the Tomlinson Foundation. LaTorsha Tomlinson ("Mrs. Tomlinson") is a director of the Tomlinson Foundation. Mr. Tomlinson and Mr. Palguta are also directors. John Ramos ("Mr. Ramos") was an independent contractor for LT Character who worked in developing curriculum.

In 2021, Ms. Mort wrote a grant to the Albertson's Foundation for use in the Tomlinson Foundation's LT Food Zones program. The grant application contemplated that Albertson's grocery store gift cards would be purchased and provided to low-income students for food supplies. That grant application requested $200,000.00. The primary purpose of this grant was to fund LT Food Zones. The Tomlinson Foundation received a grant award of $200,000.00 in 2022. In 2022, Mr. Dean asked Ms. Mort to write another grant, explaining that some of the 2022 Albertson's Foundation grant money had been spent on software development. In 2022, Ms. Mort wrote another grant for $100,000.00 from the Alberton's Foundation. The Tomlinson Foundation received the $100,000.00 award in 2023.

On August 3, 2022, Ms. Mort electronically signed a non-disclosure agreement with LT Character ("the Agreement") that contained both non-disclosure and non-circumvention provisions. The Agreement explains that "[i]n consideration for the receipt by the Recipient of [] Confidential Information, the Recipient agrees" to the terms of the Agreement. Under the

3

Agreement, Ms. Mort is prohibited from disclosing LT Character's confidential information to any

person or entity without LT Character's prior written consent. Ms. Mort is also prohibited from

copying or modifying any of LT Character's confidential information without LT Character's prior

written consent.

The Agreement defines confidential information as:

> any information or material which is proprietary to [LT Character], whether or not owned or developed by [LT Character], which is not generally known other than by [LT Character], and which [Mort] may obtain through any direct or indirect contact with [LT Character]. Regardless of whether specifically identified as confidential or proprietary, Confidential Information shall include any information provided by [LT Character] concerning the business, technology and information of [LT Character] and any third party with which [LT Character] deals, including, without limitation, business records and plans, trade secrets, technical data, product ideas, contracts, financial information, pricing structure, discounts, computer programs and listings, source code and/or object code, copyrights and intellectual property, inventions, sales leads, strategic alliances, partners, and customer and client lists. The nature of the information and the manner of disclosure are such that a reasonable person would understand it to be confidential and any other information that both parties agree in writing is not confidential.

Confidential information under the terms of the Agreement does not include "matters of

public knowledge that result from disclosure by [LT Character]," "information rightfully received

by [Ms. Mort] from a third party without a duty of confidentiality," "information independently

developed by [Ms. Mort]," "information disclosed by operation of law," and "information

disclosed by [Ms. Mort] with the prior written consent of [LT Character]."

The Agreement also prohibits Ms. Mort from "attempt[ing] to do business with, or

otherwise solicit any business contacts found or otherwise referred by [LT Character] to [Ms.

Mort] for the purpose of circumventing, the result of which shall be to prevent [LT Character]

from realizing or recognizing a profit, fees, or otherwise, without the specific written approval of

[LT Character]" for a period of five years after the end of the Agreement's term. Ms. Mort agreed to the Agreement by stating "I approve NDA/Non Circumvent."

Around this time, Mr. Dean began forming a relationship between LT Character and an entity called EDforTech, an organization located in San Diego, California that operates STEM-based programs.

Mr. Palguta testified that in 2023 members of his team at MAI asked Mr. Dean to provide documentation regarding certain expenses that the Tomlinson Foundation incurred. In September 2023, after Mr. Dean was unable to provide MAI with every desired document, Mrs. Tomlinson began working with Mr. Dean to locate receipts for certain expenditures. While working to gather relevant documents, Mrs. Tomlinson discovered expenses incurred by the Tomlinson Foundation that she believed LT Character should have paid. Mrs. Tomlinson then requested ledgers for the Tomlinson Foundation from MAI. In examining them she discovered charges and payments that in her view should not have come from the Tomlinson Foundation's bank account. These included funds provided by the Albertson's Foundation grants that the Tomlinson Foundation spent on software development.

Mr. Dean authorized approximately $44,000.00 on software development expenses in 2022 and approximately $16,000.00 in 2023. The parties dispute whether use of the Albertson's Foundation grant funds to pay for software development was an appropriate use of those funds. The evidence demonstrates that the primary purpose of the Albertson's Foundation grants was to fund LT Food Zones' gift card purchases, but the evidence does not demonstrate that that was the sole use for which the Albertson's Foundation allocated grant money. For example, Mrs. Tomlinson testified that pursuant to the language of the 2022 Albertson's Foundation grant, the grant allocated a certain amount of money to develop a software application that students could

use to earn points while participating in the "L Tech Program" and then redeem those points for food purchases. While the trial testimony was inconsistent regarding whether L Tech is a part of the for-profit LT Character or the non-profit Tomlinson Foundation, Mrs. Tomlinson testified that students would earn points in the "for-profit system" to then be used at Albertson's.

At some point after Mrs. Tomlinson began reviewing the Tomlinson Foundation's finances, Mr. Dean sent a text message to her in which he apologized for the Tomlinson Foundation's accounting failures and stated that he would probably need to resign. Mr. and Mrs. Tomlinson proceeded to remove Mr. Dean from the board of directors of the Tomlinson Foundation.

On September 1, 2023, Ms. Mort sent a text message to Mr. Tomlinson that read in pertinent part: "I will start sending you the documentation you need and will attest that you put your trust in Cliff and did not realize that he was misappropriating funds." The funds to which Ms. Mort's message referred were grant money received by the Tomlinson Foundation. At the time Ms. Mort sent the text message to Mr. Tomlinson, she had no access to the Tomlinson Foundation's books and records, and she had not undertaken any kind of investigation of the Tomlinson Foundation's books and records.

Ms. Mort was responsible for purchasing the Albertson's gift cards described previously. The grant application that she wrote in 2021 earmarked approximately $170,000.00 for Albertson's gift cards. Ms. Mort had personal knowledge of how much grant money the Tomlinson Foundation applied for from the Albertson's Foundation and approximately how much was set aside for Albertson's gift card purchases. At trial, Ms. Mort estimated that no more than approximately $50,000.00 of the 2022 Albertson's Foundation grant had been spent before Mr. Dean tasked her with writing a second grant application to the Albertson's Foundation. Ms. Mort

based this estimate on the fact that she was the only one who purchased the Albertson's gift cards. But Ms. Mort did not have personal knowledge of exactly how much money the Tomlinson Foundation expended on Albertson's gift cards. She also did not have personal knowledge of how much money the Tomlinson Foundation possessed in total before she purchased the Albertson's gift cards or before the Albertson's Foundation sent the Tomlinson Foundation its first round of grant money.

On September 19, 2023, Ms. Mort sent a text message to Mrs. Tomlinson and Mr. Ramos. In pertinent part, that message read: "Cliff is the only one who could go to prison for misappropriating grant money." When questioned about this statement at trial, Ms. Mort explained that Mr. Dean could have gone to prison for misappropriating grant funds "if he [was] guilty." But the evidence does not demonstrate that Ms. Mort had any personal knowledge at the time she made this statement that Mr. Dean had violated the criminal law. Ms. Mort did not have personal knowledge that Mr. Dean had misappropriated grant money.

Then, on September 21, 2023, in a text message to Mr. Ramos, Ms. Mort wrote in pertinent part: "Do you really think Cliff would have told him they [sic] he stole $175J [sic] in grant money[?]" By this, Ms. Mort meant that Mr. Dean had stolen $175,000.00 of grant money. But Ms. Mort likewise did not have personal knowledge that this statement was true.

On December 7, 2023, Ms. Mort received a cease and desist letter from LT Character and Mr. Dean's counsel that stated that her services with LT Character had been terminated. That same day, Ms. Mort sent Mrs. Tomlinson a text message that read in pertinent part: "Did I ever send you a copy of the sexual harassment / hostiñe [sic] work environment complaint I filed against him?" By this Ms. Mort meant a sexual harassment and hostile work environment complaint against Mr. Dean. However, at trial, Ms. Mort conceded that she never actually filed such a complaint.

Plaintiffs filed this case on October 29, 2024. Mr. Tomlinson did not agree to bringing a lawsuit against Ms. Mort in LT Character's name.

## CONCLUSIONS OF LAW

Mr. Tomlinson and Mr. Dean are citizens of Texas. Therefore, LT Character is likewise a citizen of Texas. *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1081 (5th Cir. 2008). Ms. Mort is a citizen of Arizona. The amount in controversy exceeds $75,000.00. The Court has diversity jurisdiction over this case.

### A.      Law Relating to Cliff Dean's Authority to Sue as LT Character

Under Texas law, "an action of a limited liability company not apparently for carrying out the ordinary course of business of the company must be approved by the affirmative vote of the majority of all of the company's governing persons." Tex. Bus. Orgs. Code Ann. § 101.356(b) (West 2026). As LT Character has two governing persons, an action beyond the ordinary course of business requires the affirmative vote of both Mr. Dean and Mr. Tomlinson. *See* Ex. 29; Tex. Bus. Orgs. Code Ann. § 101.251(b)(1) (West 2026),

Mr. Tomlinson did not consent to LT Character's suing Ms. Mort. Nor did any evidence at trial allow the Court to reasonably infer that the filing of this lawsuit was in the ordinary course of LT Character's business. As a result, because the filing and prosecution of this action is not activity within the ordinary course of LT Character's business, Mr. Dean did not have authority to bring the breach of contract claim against Ms. Mort in LT Character's name. *See St. Star Designs, LLC v. Gregory*, No. H-11-0915, 2011 WL 3925070, at *3 (S.D. Tex. Sept. 7, 2011) (finding that filing a lawsuit is not within the ordinary course of a limited liability company's business); *In re CorrLine Int'l, LLC*, 516 B.R. 106, 138 (Bankr. S.D. Tex. 2014) (Bohm, B.J.) ("Texas courts and other courts interpreting Texas law have consistently held that . . . hiring counsel to pursue or

8

defend litigation is not within the 'ordinary course of business.'" (citing *Kaspar v. Thorne*, 755 S.W.2d 151, 154 (Tex. App.—Dallas 1988, no writ))).

Mr. Dean's arguments concerning whether he complied with the procedural requirements under Texas law to bring a derivative action in LT Character's name are inapposite. Plaintiffs' pleadings do not allege a shareholder derivative action and the facts do not suggest that Mr. Dean brought the breach of contract claim against Ms. Mort derivatively, but rather in LT Character's own name. *See* ECF No. 12. This he did not have authority to do. LT Character's breach of contract claim against Ms. Mort is dismissed without prejudice.

### B.      Law Relating to Breach of Contract

Even if Mr. Dean had authority to sue in LT Character's own name, or derivatively as a manager or member of LT Character, the breach of contract claim against Ms. Mort independently fails.

The elements of a breach of contract claim are "(1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach." *Brooks v. Excellence Mortg., Ltd.*, 486 S.W.3d 29, 36 (Tex. App.—San Antonio 2015, pet. denied). A valid contract in Texas must be supported by consideration, and if it is not, it is illusory and cannot be enforced. *Harris v. Blockbuster Inc.*, 622 F. Supp. 2d 396, 397 (N.D. Tex. 2009). "Consideration is a present exchange bargained for in return for a promise. It consists of either a benefit to the promisor or detriment to the promisee." *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991).

The text of the Agreement between LT Character and Ms. Mort rooted Ms. Mort's obligations "[i]n consideration for the receipt by the Recipient of the Confidential Information." Ex. 14, § II. However, the evidence does not definitively demonstrate that from the time Ms. Mort signed the Agreement (August 3, 2022), to the time her association with LT Character ended, Ms.

9

Mort ever received confidential information. The evidence does not demonstrate that Ms. Mort had access to algorithms or other confidential information related to software development. Nor does the evidence demonstrate that Ms. Mort received any kind of confidential information in satisfaction of the Agreement after she signed it. In fact, Mr. Dean testified that he could not say what confidential information Ms. Mort received after she signed the Agreement. Tr. 162:7-162:23. He opined that he was "sure that there [was] information" Ms. Mort received, but he could not say what. Tr. 162:16-17. The Court finds that Mr. Dean's testimony is not credible. This is especially so given Mr. Dean's other testimony that LT Character contractors who had access to proprietary information had "access to that information . . . the day they started." Tr. 160:1-2. Ms. Mort was such a contractor.

At one point, Mr. Dean opined that Ms. Mort was "prohibited" under the terms of the Agreement from "using" LT Character's "sales pipeline," "contacts," "the pipeline from the EDforTech relationship," and certain "proprietary data" that he alleged some individuals "reverse engineered" into "web form technology" to "be able to service accounts outside of the LT Character entity." Tr. 194:5-19. Without specifics, the Court cannot conclude that Ms. Mort received any of this potential information at any time after August 3, 2022. And whether the information Ms. Mort received came to her before she signed the Agreement or afterward is important because "confidential information . . . provided [to the Recipient] before [s]he signed [a] non-compete agreement cannot form the consideration for the agreement because past consideration is not competent consideration for contract formation." *Powerhouse Prods., Inc. v. Scott*, 260 S.W.3d 693, 697 (Tex. App.—Dallas 2008, no pet.).

The Court finds that LT Character's legal argument and case citations in support of the proposition that new consideration is not required are unavailing and inapposite. *See Jowell v.*

*BioTE Med., LLC*, No. 05-21-00166-cv, 2021 WL 4810361, at \*11 (Tex. App.—Dallas, no pet.) (finding competent consideration in "specialized knowledge of and access to Confidential Information [that] the Company will continue to develop and/or that Grantee will *newly* receive from the Company during and after the period of this Award Agreement." (emphasis added)); *id.* ("He got *new* prospects . . . . We had *new* and updated trainings.") (emphasis added)); *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 297 (Tex. App.—Beaumont 2004, no pet.) ("*Subsequent* to signing the agreement, [the information provider], *on a daily basis*, made confidential information available to [the recipient]." (emphasis added)); *Weber Aircraft, L.L.C. v. Krishnamurthy*, No. 4:12-cv-666, 2014 WL 12521297, at \*5 (E.D. Tex. Jan. 27, 2014) ("It is undisputed that *after* they signed the Agreement, Defendants . . . received confidential information. Further, Plaintiff's evidence reveals that Defendants *continued* to receive confidential information[] *throughout* their employment with Plaintiff." (emphasis added)). Mr. Dean's general inability to point to confidential information that Ms. Mort received after she signed the agreement distinguishes this case from those LT Character cites in support.

At most, Mr. Dean explained that LT Character's relationship with EDforTech had existed for "almost a year" before September 2023. Tr. 195:7-10. But this testimony does not answer the important question of exactly when that relationship, if it was confidential information, reached Ms. Mort. Was it before August 3, 2022, or after that date?

However, even if Ms. Mort's awareness of this burgeoning relationship between LT Character and EDforTech could be considered consideration for the Agreement, and even if Ms. Mort received that information after she signed the Agreement, the evidence does not support Mr. Dean's position that Ms. Mort indeed violated the Agreement. The Court finds that there was no credible evidence that Ms. Mort utilized any confidential contacts, materials, or other information

obtained from her time and work with LT Character in violation of the Agreement. Mr. Dean's testimony that a nameless "they" "were collectively servicing [LT Character's] accounts, . . . contracts, [and] partners" is not credible evidence of how Ms. Mort allegedly violated the Agreement. Tr. 196:20-21. At most, Mr. Dean testified that Ms. Mort "used our data," and was "involved with" certain contacts. Tr. 196:22-197:12. But he could not testify that Ms. Mort herself reverse engineered the web form he accused someone of generating, Tr. 196:11, did not explain what data Ms. Mort is alleged to have disclosed, and conceded that he did not know if Ms. Mort serviced LT Character contracts at the Tomlinson Foundation, while asserting without specifics that she merely "was involved with those contracts." Tr. 197:11-12. The Court does not find this testimony credible. And to the extent Ms. Mort was in contact with certain school districts or school officials, Mr. Dean conceded at trial that such information was publicly available. Tr. 195:21-24; *see also* Ex. 14, § II (defining confidential information as that "which is not generally known other than by the Owner"); *id.* § II.A (confidential information does not include "information independently developed  by [Ms. Mort]").

No credible evidence establishes that Ms. Mort disclosed confidential information in violation of the Agreement. No credible evidence establishes that Ms. Mort copied, modified, disseminated, or misappropriated confidential information in violation of the Agreement. Nor does any credible evidence establish that Ms. Mort violated the non-circumvention clause of the Agreement. While it is altogether likely that the Agreement fails for lack of consideration as it is, the Court finds that no credible evidence supports LT Character's position that Ms. Mort breached the Agreement. Therefore, the Court finds that Ms. Mort did not breach the Agreement with LT Character.

C.       Law Relating to Defamation

The elements of a defamation claim are: "(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se)." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017). "'Publication' occurs if the defamatory statements are communicated orally, in writing, or in print to some third person who is 'capable of understanding their defamatory import and in such a way that the third person did so understand.'" *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017) (quoting *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.)). "A statement is defamatory if it tends to injure the subject's reputation, to expose [him] to public hatred, contempt, ridicule, or financial injury, or to impeach [his] integrity, honesty, or virtue." *Backes v. Misko*, 486 S.W.3d 7, 24 (Tex. App—Dallas 2015, pet. denied). "A statement that injures a person in [his] office, profession, or occupation is typically classified as defamatory *per se*." *Hancock v. Variyam*, 400 S.W.3d 59, 64 (Tex. 2013). "Historically, defamation *per se* has involved statements that are so obviously hurtful to a plaintiff's reputation that the [fact finder] may presume general damages, including for loss of reputation and mental anguish." *Id.* at 63-64.

Mr. Dean contends that Ms. Mort made three defamatory statements about him: (1) "Cliff is the only one who could go to prison for misappropriating grant money," Ex. 2; (2) "Do you really think Cliff would have told him th[at] he stole $175[k] in grant money," Ex. 9; and (3) "Did I ever send you a copy of the sexual harassment . . . complaint I filed against [Cliff]?" Ex. 1. *See* ECF No. 103 at 15. Regarding these statements, the Court finds the following.

Ms. Mort made each of the referenced statements. Ms. Mort published each statement to a third party in writing. Each statement is defamatory in nature. Each statement was a statement of

fact, not opinion. Mr. Dean is a private individual, not a public figure. Ms. Mort failed to investigate the truth or falsity of her statements before publication. In so doing, Ms. Mort failed to act as a reasonably prudent person would.

The evidence clearly and convincingly demonstrates that Ms. Mort never filed a sexual harassment complaint against Mr. Dean. The evidence also did not prove that Mr. Dean stole $175,000.00 in grant money or committed criminal misappropriation. While the evidence reflected genuine concerns from several individuals over how grant money was spent, Mr. Dean presented credible evidence that Ms. Mort's specific defamatory statements were false. *E.g.*, Ex. 49 at 10:15-17; *id.* at 11:19-12:1; *id.* at 17:5-9; *id.* 103:9-14.

Further, the Court finds that the qualified privilege affirmative defense is unavailable to Ms. Mort because the evidence of Ms. Mort's lack of access to Tomlinson Foundation financial information demonstrated that Ms. Mort lacked a good faith basis to support her allegations of Mr. Dean misappropriating any money, much less the specific sum of $175,000.00. Nor did Ms. Mort have a good faith basis to lie about filing a sexual harassment complaint when she admitted at trial that she did no such thing. *See* Tr. 58:9. Finally, the Court finds that the statements Ms. Mort made are defamatory *per se* in that they accuse Mr. Dean of criminal and sexual misbehavior. In Mr. Dean's line of work, Ms. Mort's statements would have a negative reputational effect.

Therefore, the Court concludes that Mr. Dean established each element of his claim for defamation against Ms. Mort and finds that Ms. Mort defamed Mr. Dean.

## CONCLUSION

The Court concludes that Mr. Dean did not have authority to sue Ms. Mort in LT Character's name, but even if he did, either directly in LT Character's name or derivatively, Ms. Mort did not breach the Agreement with LT Character. However, Ms. Mort did defame Mr. Dean.

Mr. Dean shall have judgment against Ms. Mort for nominal damages of $1.00. The parties shall

file any motions for reasonable attorney's fees and bills of costs no later than February 17, 2026,

pursuant to Local Civil Rule 54.1 and Federal Rule of Civil Procedure 54.

It is so **ORDERED** on February 2, 2026.

_____

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE